# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Case Nos. 5D2023-1079
5D2023-1410
LT Case No. 2014-DR-04642-FM

———————————————

NANCY ROSENBERG,

    Appellant/Cross-Appellee,

    v.

LEE ROSENBERG,

    Appellee/Cross-Appellant.

———————————————

On appeal from the Circuit Court for Duval County.
Lance M. Day, Judge.

Michael G. Tanner, Megan K. Moon, and Justin T. Delise, of Gunster, Yoakley & Stewart, P.A., and Michael R. Phillips, of Fletcher & Phillips, PLLC, Jacksonville, for Appellant/Cross-Appellee.

Elliot Zisser, of Zisser Family Law, PLLC, Neptune Beach, and Michael J. Korn, of Korn & Zehmer, PA, Jacksonville, for Appellee/Cross-Appellant.

June 21, 2024

MAKAR, J.

This marital dissolution case, along with a related case,[1] involves the calculation of personal goodwill in the same multi-member medical practice, North Florida Anesthesia Consultants ("NFAC") in Jacksonville, which was sold to a corporation. Personal goodwill is value attributable to the reputation and skill of the physician-shareholders in providing medical services to their patients; in contrast, enterprise goodwill is value from ongoing referrals to and patronage of the medical practice that is separate and apart from personal goodwill.[2] Under Florida law, the personal goodwill of a medical practitioner in a *solo* practice is not a marital asset.[3] At issue in this case is the unresolved legal question of whether the personal goodwill of medical practitioners in a *multi-member* practice is non-marital as well. The trial court answered this question affirmatively, adopting an approach that excluded the personal goodwill of all shareholder-physicians as non-marital.

## I.

Nancy and Lee Rosenberg were married in 1988, living together until Nancy petitioned for dissolution of marriage in May 2014. Lee is an anesthesiologist who completed his medical residency in 1993 and soon thereafter became employed with NFAC in which he became a shareholder three years later. By late 2015, thirty-four other physicians were equal shareholders of NFAC with Lee.

Nancy and Lee divorced, agreeing upon the allocation of their assets, reflected in a consent final judgment in January 2016. Lee

---

[1] *Conde-Berrocal v. Conde*, No. 5D2023-0449, 2024 WL ___, at __ (Fla. 5th DCA June 21, 2024).

[2] The supreme court in *Thompson v. Thompson*, 576 So. 2d 267, 268 (Fla. 1991), used the phrase "professional goodwill," which is synonymous with "enterprise goodwill." Because the latter best captures the phrase's true meaning, it is used here.

[3] *See, e.g., Weinstock v. Weinstock*, 634 So. 2d 775, 776 (Fla. 5th DCA 1994); *Young v. Young*, 600 So. 2d 1140, 1141 (Fla. 5th DCA 1992).

retained sole ownership and possession of his marital interest in his medical practice, which included NFAC and its corporate affiliate, Medi-Bill of North Florida, Inc. ("MediBill"); his interest in NFAC at that time was valued at $122,800 and his interest in MediBill was valued at $26,557. Based on the value of the parties' overall assets, including Lee's interests in NFAC and MediBill, Nancy made an "equalizing payment" of $129,485 to Lee.

Just prior to the entry of the January 2016 consent judgment, however, Nancy took Lee's deposition, in which he failed to disclose the then-ongoing efforts to sell the medical practice. As it turns out, NFAC had been exploring the sale of both its medical practice and MediBill since June 2015. Those efforts culminated in the physician/shareholders, including Lee, selling their interests in both entities to Sheridan Healthcorp., Inc. ("Sheridan") for $99,450,000 in April 2016. Lee received approximately $2,650,000 for his NFAC and MediBill interests plus additional sale proceeds of approximately $150,000 to be paid in 2017 and 2018; each physician received approximately $56,000, after taxes, for their shares in MediBill. None of this was made known to Nancy.

As was inevitable, in May 2016, Nancy learned of the multimillion-dollar Sheridan deal and moved to vacate the consent judgment, arguing that but for Lee's misrepresentations she "would never have agreed to the equitable distribution and alimony provisions of the final judgment." The trial court granted her motion, finding that Lee "should have disclosed his full knowledge" about the Sheridan situation. Lee appealed that ruling, which was affirmed without opinion.[4]

On remand, the trial court held proceedings to determine the value of Lee's interests in NFAC and MediBill, Lee's expert was Alexander Rey and Nancy's was Josh Shilts. Each expert took a

---

[4] At that time, this case was docketed in the First District Court of Appeal, which ruled against Lee, *see Rosenberg v. Rosenberg*, 311 So. 3d 840 (Fla. 1st DCA 2021); this case was thereafter transferred to this court on January 1, 2023. *See* Ch. 2022-163, § 15, Laws of Fla.

slightly different analytical approach in how they calculated personal and enterprise goodwill.

Rey testified that the entire value of the NFAC medical practice was composed of intangible assets. That's because the firm's balance sheet showed no meaningful tangible assets, such as real estate, equipment, or the like; instead, "virtually all" of the practice's value "was intangible" in the form of the "personal goodwill" of the physicians and "enterprise goodwill" that "attaches to the reputation of the entity itself." Based on his revenue model, he estimated that the total net value of the Sheridan transaction was $71,660,000, consisting solely of personal and enterprise goodwill.

He next estimated what percentage of this value was attributable to personal goodwill versus enterprise goodwill. To do this, he calculated that 56% of NFAC's total revenue came from surgery facilities with "nonexclusive" contracts, meaning that those facilities could request specific anesthesiologists from either NFAC or elsewhere.[5] The underlying premise was that about half of the practice's revenues arose from the "preferences" expressed and choices made for NFAC anesthesiologists under the nonexclusive contracts, reflecting a rough approximation of revenues due to the personal goodwill of preferred physicians.

Rey rounded this percentage down to 50%, using it as a rough proxy for the total personal goodwill of the thirty-five physicians. His estimate of the combined personal goodwill of all thirty-five physicians was $35,830,000 (50% of $71,660,000). He deducted this amount of personal goodwill from the total net value of the Sheridan transaction. The resulting value, also $35,830,000, was deemed "enterprise goodwill" because it came from revenues due to exclusive contracts between NFAC and surgery facilities, i.e.,

---

[5] It bears noting that the market for anesthesiologists is not driven by patient demand; instead, it is generally surgeons and surgical facilities who seek out or have preferences for particular anesthesiologists with whom they like to work. As Rey stated, it is not an anesthesiologist's "reputation with the patients that matters"; instead, it is the "reputation with the surgeons and facilities that they work at that matters."

NFAC's medical services were required under these contracts versus preferred on an individualized basis. After excluding personal goodwill as non-marital, Rey's conclusion was that the marital value to Lee of his share of the NFAC practice in April 2016 was approximately *$1,000,000*.

Nancy's expert witness, Josh Shilts, used Rey's formula and calculations generally. But rather than exclude the personal goodwill of all the physicians, he excluded only Lee's personal goodwill from the total net value of the NFAC transaction. He estimated that Lee's personal goodwill was 3.55% of the value of the transaction due to Lee's greater productivity in the practice, which equated to $2,544,000 (i.e., $71,660,000 x 3.55%, rounded up). Under Shilts's approach, he arrived at a figure of $69,116,000 (i.e., $71,660,000 - $2,544,000) as the total value to be apportioned. Shilts divided this amount by the total number of physicians (35) resulting in his estimate of *$1,977,000* of the practice's pro rata value (rounded) to be divided between Nancy and Lee as marital property. This approach effectively treated all the other physicians' personal goodwill as enterprise goodwill to be apportioned in the marital award and resulted in an amount almost double that of Rey's estimate as the following chart reflects.

|  | Rey | Shilts |
|---|---|---|
| Net Value | $71,660,000 | $71,660,000 |
| -Personal Goodwill | $35,830,000 | $2,544,000 |
| =Total | $35,830,000 | $69,116,000 |
| ÷ 35 | ~$1,000,000 | ~$1,977,000 |

The trial court—the same as in *Conde-Berrocal*—adopted Rey's methodology and valued Lee's marital interest in NFAC as $1,000,000 as of April 1, 2016. Nancy appeals that determination.[6]

II.

Florida caselaw neither addresses nor adequately explains how the calculation of personal goodwill is done in a *multi-member*

---

[6] Lee cross-appealed, challenging the trial court's ruling on a Fidelity investment account, as well as an award of attorneys' fees, both of which are affirmed.

professional practice, here anesthesiologists. The casebooks have many *solo* practitioner examples involving law firms, medical practices, and accounting partnerships, all concluding that the personal goodwill of a solo practitioner is non-marital under Florida law. This case would be easy if Lee was a solo practitioner: excluding his personal goodwill from the overall valuation of his solo medical practice would lead to the result envisioned in *Thompson v. Thompson*, 576 So. 2d 267 (Fla. 1991), the foundational supreme court case on goodwill in the marital context.

The flashpoint in this case is the difference in the methodologies of the two experts: Should the personal goodwill of all the physicians collectively be excluded from total net value of the Sheridan transaction, as Rey did, or should only Lee's personal goodwill be subtracted, as Shilts did? Nancy primarily relies on *Thompson*, in which our supreme court first recognized that goodwill accumulated in a spouse's legal practice during a marriage may be a marital asset, but that it "must exist separate and apart from the reputation or continued presence of the *marital litigant*." *Id*. at 270 (emphasis added). She relies on the phrase "marital litigant," used only this once in *Thompson*, to conclude that exclusion of the personal goodwill of only the "marital litigant," in this case, Lee, is required.

That argument overlooks that *Thompson* was a solo practitioner case involving a spouse running his own legal practice. The supreme court's holding makes sense because the exclusion of the personal goodwill of the lone "marital litigant" in that case was all that was at issue. *Id*. *Thompson* simply did not address how to deal with personal goodwill in the multi-member professional context. Indeed, the other cases Nancy cites are solo practitioner cases, *see Weinstock v. Weinstock*, 634 So. 2d 775, 776 (Fla. 5th DCA 1994) (discussing the husband's dental practice); *King v. King*, 313 So. 3d 887, 889 (Fla. 1st DCA 2021) (discussing a family-owned insurance agency with husband as CEO who managed its business affairs), or are inapt, *see Soria v. Soria*, 237 So. 3d 454, 459 (Fla. 2d DCA 2018) (discussing where one spouse founded a company and was CEO, but the trial court did not make any "findings with regard to goodwill").

What is evident in the caselaw, and what decides this case, is that personal goodwill of a professional is simply not a marital asset in Florida. Personal goodwill, whether it be that of a divorcing spouse or any one of thirty-four physician/shareholders in a medical practice, is "not a marketable asset distinct from the individual" who performs services. *Thompson*, 576 So. 2d at 270 (quoting *Taylor v. Taylor*, 386 N.W.2d 851, 858 (Neb. 1986)). As the supreme court in *Thompson* recognized, personal goodwill—no matter the business setting—is not a part of enterprise goodwill. The court

> agree[d] with the observation of the Supreme Court of Missouri when it stated:
>
> > *Irrespective of the setting in which it is found, the meaning of goodwill does not change.* It is property which attaches to and is dependant [sic] upon an existing business entity; *the reputation and skill of an individual entrepreneur*—be he a professional or a traditional businessman—*is not a component of the intangible asset we identify generally as goodwill.*

576 So. 2d at 269 (quoting *Hanson v. Hanson,* 738 S.W.2d 429, 434 (Mo. 1987) (emphasis added)). The highlighted language emphasizes that personal goodwill is separate and apart from enterprise goodwill; personal goodwill "represents nothing more than probable future earning capacity" that "is not a proper consideration in dividing marital property in a dissolution proceeding." *Thompson,* 576 So. 2d at 270 (quoting *Taylor,* 386 N.W.2d at 858).

Because personal goodwill cannot be considered in the division of marital assets, and is not a part of enterprise goodwill, it must *ipso facto* be excluded in calculating the value of a purported marital asset in a dissolution proceeding. Applied here, this principle requires that the personal goodwill of the thirty-five physicians must be excluded; it is collectively a non-marital asset

of each of the respective physicians. Just as Lee's personal goodwill is his own non-marital asset, the personal goodwill of the other thirty-four physicians is their own non-marital asset; it thereby must be excluded from the consideration of the market value of the transaction at issue, as expert Rey did.[7]

An example demonstrates this point. Imagine that all thirty-five NFAC physicians were simultaneously divorcing their spouses. Using Shilts' approach, each of the thirty-five former spouses would be entitled to approximately $1,977,000, which if multiplied by 35 equals about $69,195,000—an amount that is almost the *entire net value* of the Sheridan transaction. The entirety of the physicians' personal goodwill would be allocated to the former spouses, leaving the thirty-five physicians with next to nothing, despite each having legal entitlement to approximately $1 million of non-marital personal goodwill. Such a result would be contrary to *Thompson* and the legal concept that personal goodwill is non-marital.

In conclusion, the trial court was correct in adopting a valuation methodology that excluded the personal goodwill of all the physicians from the net value of the sale of the medical practice. No Florida case directly addresses the issue presented, making this a case of first impression on an important family law question. Because our decision has obvious ramifications and binds trial courts statewide, we certify the following question as one of great public importance for the supreme court's consideration.

> IN A MARRIAGE DISSOLUTION CASE, MUST THE VALUE OF THE PERSONAL GOODWILL OF ALL PHYSICIAN-SHAREHOLDERS IN A MULTI-MEMBER MEDICAL PRACTICE BE EXCLUDED FROM THE NET VALUE OF THE SALE OF THE PRACTICE IN DETERMINING THE MARITAL VALUE OF THE PRACTICE?

AFFIRMED.

---

[7] As Rey opined, "[i]f Dr. Rosenberg's own personal goodwill is not a marital asset, I don't see how [other NFAC anesthesiologists'] personal goodwill would be a marital asset of [Dr. Rosenberg]."

WALLIS and PRATT, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____